MR. JUSTICE SHEA,
dissenting:
By a simple stroke of the pen, and by a failure to fairly analyze the evidence, the majority declares that plaintiff failed to show a connection between the 1972 Goodyear contributions to the Committee to Re-elect the President and the government’s decision later that year, after President Nixon had been relected to quietly end the government’s multi-piece rim product safety invtstigation. The majority states (pp. 1217):
“Our careful review of the very extensive record, shows a total absence of evidence connecting the political contribution of Goodyear to the investigation by a federal agency of multi-piece rims of the type which injured the plaintiff. As a result, it is clear that the evidence of Goodyear’s contribu *78 tion to the Committee to Re-elect the President was inadmissible under Rule 402, Mont.R.Evid.”
This conclusion arrived at by reviewing the testimony of Mr. Malek in isolation, could not be farther from the truth. Justices Morrison and Sheehy have amply set forth the contrary evidence, evidence that fully justified the jury in inferring the necessary facts in a circumstantial case, to award exemplary damages against Goodyear.
It was not merely a coincidence that the National Highway Traffic Safety Administration closed its official investigation on December 31, 1973, less than two months after the re-election of President Nixon, thereby avoiding an expensive consumer notification program or possibly even a government request that Goodyear voluntarily recall its K-rim wheels.
Goodyear was vitally concerned about the investigation and the ramifications of notifying consumers that the K-rim wheels were dangerously defective. The projected cost to Goodyear was 145 million dollars, and it was characterized as an “overwhelming problem.” Goodyear was fully aware that the governmental investigation had top priority — but then the Goodyear people went to work.
In February and March 1972, Goodyear made its contributions to the Committee to Re-elect the President. Three days after these contributions, the person who headed the investigation for the government, Joseph Clark, was removed from his position and transferred to an innocuous position in Ohio. His replacement, Andrew Detrick, had no background in product defects investigation.
After Detrick’s appointment and a few months after the contributions (August 1972), a Goodyear representative, Joseph Hutchinson, met with Detrick to discuss the K-rim wheel investigation. This Goodyear agent later summarized this meeting in a memo to his company, by explaining that Detrick indeed felt a safety problem existed (for the wheels still being used by the public) but “that he [Detrick] would like to handle this problem before it gets publicity.” By the *79 end of December his task was accomplished.
In the following months after August Goodyear executives succeeded in lobbying Detrick against a governmental requirement that Goodyear notify purchasers of the potential hazards of the K-rim wheels. In late December 1972, after President Nixon was re-elected and while Egil Krogh was Undersecretary of the Department of Transportation, the government quietly announced that the multi-piece wheel investigation was ended.
Goodyear’s political contributions took on added meaning because of the revelations during the Watergate episode, and especially revelations before the Ervin Committee investigating the Watergate Hotel break-in and its ramifications. These developments proved that Goodyear attempted to cover up the source of the corporate contributions to the Committee to Re-elect the President. It was also established that Goodyear attempted to cover up the significance of the contributions by the testimony of its chairman, who testified that when the contributions were made Goodyear was not involved in significant proceedings with the government. But it was revealed that Goodyear had two rather significant proceedings pending with the government, both proceedings involving multi-piece wheel rims — wheel rims like the one that burst apart and grievously injured Dennis Kuiper.
Post-election Watergate investigations developed the connection between the Watergate burglary and the Committee to Re-elect the President — that is, the Committee, directly or indirectly, brought about the Watergate burglary. After these revelations, Goodyear was asked to reveal its contributors, but Goodyear, through Chairman DeYoung and Arden Firestone, decided that instead the corporation would claim that corporate officers had individually given the monoy rather than the corporation. This evidence was given to the Ervin Committee. This continuing coverup is circumstantial evidence that the jury was entitled to hear as bearing on the motivations of Goodyear in making the con *80 tributions to the Committee to Re-elect the President.
Through a videotape of Goodyear Chairman DeYoung’s testimony before the Ervin Committee, the jury saw and heard his falsifications. He admitted that it was only pressure from the Special Prosecutor Archibald Cox and fear of adverse publicity that Goodyear was finally persuaded to admit that the contributions were actually corporation contributions. The Goodyear chairman was asked whether these contributions were motivated by ulterior motives and Chairman DeYoung replied that the contributions were motivated solely “for the good of the country. ” Yet he testified falsely in stating that when the contributions were made, no governmental action of any consequence was pending. The uncontradicted and undeniable evidence was that two significant government proceedings were pending regarding the multirim wheels. First, the government was conducting the multi-rim wheel defect investigation, and the Goodyear company projected a government ordered consumer notification program to cost Goodyear at least 145 million dollars. Second, the government also had pending rulemaking proceedings involving multi-piece wheel rims. Both government proceedings involved the same kind of multi-piece wheel rims that burst apart into Dennis Kuiper’s head.
Although the majority would grant a new trial and order that evidence of the government investigation of the multipiece wheel rims and political contributions of Goodyear be excluded nowhere does the majority discuss the evidence that was admitted at trial. Instead, the majority focuses on the opening statement of plaintiff’s counsel and on the testimony of Mr. Malek before the Ervin Committee. As a result of this selective focusing, the majority declares:
“. . . The key element is that plaintiff completely failed to connect the political contribution of Goodyear to the federal investigation of the multi-piece wheels. The plaintiff failed to prove that the contribution was related in any manner to the multi-piece wheel, which exploded and caused the injury to the plaintiff.” (At 1218.)
*81 I am not sure I understand this conclusion by which the majority declare that plaintiffs proof failed. The conclusion appearsto have two parts, but I do not believe that as to the second part, the majority truly mean what it says. In the first sentence, the majority states that plaintiff did not establish the connection between the political contributions and governmental multi-piece wheel investigation. If this is the key conclusion, it could only have been reached by ignoring the evidence set forth by Justices Morrison and Sheehy in their dissents. But if in the second sentence the majority is stating that plaintiff had a duty to prove the contributions were made to influence governmental action on the particular wheel rim that injured plaintiff, the majority has placed an impossible burden on all plaintiffs, for that kind of proof is impossible. I do not, however, believe that the majority would impose such a requirement, although by the language used, it appears that it has.
Assuming that the majority holding is confined to the conclusion that plaintiff did not prove the connection between the political contributions and multi-piece wheel rim investigtion, how does the majority reach this conclusion? Reliance is placed on the opening statement of plaintiffs counsel which failed, in the eyes of the majority, to make this connection, and on the testimony of Mr. Malek, a member of the Committee to Re-elect the President, who testified he knew of no connection between the contributions and any attempt by Goodyear to influence government action on any matter.
The majority opinion confuses me. The opinion devotes several pages to quoting parts of the opening statement of plaintiffs counsel as it relates to the political contributions and the government investigation of the multi-piece wheels. The majority also says the opening statement was defective because it did not set forth the connection between Goodyear’s contributions and the government’s investigation of the wheels manufactured by Goodyear. The majority then appears to say that because the opening statement was de *82 fective, it ipso facto prejudiced the trial. And yet the majority does not appear to grant a new trial because of its declaration that the opening statement was defective. Rather, the majority grants a new trial, and orders evidence excluded at the new trial, because the trial evidence did not establish the connection between the Goodyear contributions and the government investigation of Goodyear’s multipiece wheels. To reach this conclusion from the trial evidence, the majority relies exclusively on the testimony of Mr. Malek, a member of the Committee to Re-elect the President. This is hardly classifiable as even-handed appellate review.
Although the majority devotes several pages of the opinion to quoting the opening statement of plaintiffs counsel, the opening statement has no bearing on the issues relied on by the majority to vacate the jury verdict. The majority orders a new trial based on its perception of the evidence, presented at trial, not on whether the opening statement was either defective or prejudicial. The opening statement is not evidence and it can shed no light on whether the trial evidence established the connection between the political contributions and the government investigation. Rather than to quote from the opening statement, which is not used as a basis to grant a new trial, it is the majority’s obligation to fairly deal with the evidence presented at trial — the evidence set forth by Justices Morrison and Sheehy in their dissents.
REASONS GIVEN FOR THE INADMISSIBILITY OF THE EVIDENCE ARE ILLUSORY:
Why must the government investigation and political contribution reach the eyes and ears of the jury? The majority lists several reasons, and states in essence as to each that the jury was allowed to speculate with no evidentiary foundation, and therefore its conclusions are unfounded. I believe, however, that sufficient evidence was presented for the jury to fit the pieces together and reach its verdict as *83 sessing exemplary damages against Goodyear. I discuss each of the reasons listed by the majority, which are illusory at best.
What is so important, so vital in Mr. Malek’s testimony that the majority orders a new trial and evidence to be excluded from the second trial? Malek, a member of the Committee to Re-elect the President, testified, according to the majority’s summary, that he had no knowledge of situations in which “proceedings before any department or agency were interfered with, influenced, or obstructed.” Assuming the truth of this statement, it proves only that Mr. Malek had no knowledge of attempts by re-election committee members on behalf of Goodyear or other contributors, to influence government proceedings then pending. Malek’s testimony does not exonerate the entire reelection commit-toe, it does not exonerate the officials of the Department of Transportation, and it certainly does not exonerate the Goodyear officials.
On its face, and considered in an evidentiary vacuum, Malek’s testimony establishes nothing for or against plaintiff. But when considered with other testimony and evidence admitted at trial, Malek’s testimony was not irrelevant. The jury was entitled to conclude, based on all the evidence, that Malek’s testimony before the Ervin Committee was simply another effort to cover up and therefore should be given no weight. Or, alternatively, if the jury believed Malek’s testimony before the Ervin Committee, the jury was entitled to conclude that Malek was walking through those times wearing a blindfolder and earplugs.
And now to the reasons given for the inadmissibility of the governmental investigation and political contribution evidence.
First, the majority says the jury was impermissibly allowed to speculate on the K-rim wheel investigation. Just what speculation was permitted of the jury, the majority doesn’t say. But the majority says that speculation on the investigation was impermissible because Goodyear had vol *84 untarily discontinued the manufacture of the K-rim wheels three years before the investigation and because at the time of the investigation the government didn’t have the authority to order a wheel recall. This reasoning is baffling and misses the point. Voluntary discontinuing production of an item does not establish that the item already in the hands of the public was not defective and dangerous. Nor does the presence or absence of power to recall a product establish that the product already in the hands of the public was not defective. In fact, discontinuance or production may have been motivated by the conclusion that the product was both defective and dangerous to the public.
Nor does the presence or absence of governmental power to recall defective products bear on Goodyear’s motives in influencing a favorable governmental decision on the investigation. The undeniable fact is that the government did have the authority to investigate defects and to require the manufacturer to notify the consumers who had come into possession of those products by the distributing efforts of the manufacturer. Here the situation is that the Department of Transportation did not order a notification campaign and in fact closed the investigation shortly after the re-election of the President. The totality of the evidence supported a jury inference that the investigation was closed because the campaign contributions had their intended effect.
Second, in concluding that the evidence impermissibly allowed the jury “to surmise, with no evidentiary support, that there was a White House Commitment before Goodyear made its contribution,” the opinion relies entirely on the testimony of Malek before the Ervin Committee to establish this fact. (Emphasis added.) The Malek memorandum, however, was not offered to prove a pre-existing commitment from the White House to grant political favors to contributors. The memorandum spoke for itself: it simply suggested that the re-election functionaries were out to politicize the executive branch of government by using the *85 enormous influence of governmental favors as the carrot.
It is odd indeed that although the majority relies entirely on the Malek memorandum as the impermissible evidence by which all the evidence was to be measured, not once does the majority discuss this evidentiary piece of evidence other than the reference to it in from the opening statement of plaintiff’s counsel. The majority overlooks the fact that the essential question at all times was whether Goodyear made political contributions with an expectation of reaping favorable governmental action on issues close to Goodyear’s pocketbook. It is not important whether the governmental officials, or those claiming to have the power to influence governmental decisions, committed themselves before or after the contributions. The motives and actions of the Goodyear officials were on trial, and the motives and actions could only be demonstrated by proof of governmental complicity. With Goodyear’s actions as the focal point I have no doubt that the jury had before it a strong circumstantial case that Goodyear expected to reap handsome returns from favorable governmental action on the multi-rim wheel investigation. Who knows, had the investigation not been closed after President Nixon’s reelection, possibly the very tire rim that exploded into Dennis Kuiper’s head would not then have been in use.
Although evidence of attempts to influence an investigation by political contributions would be sufficient by itself for the jury to consider exemplary damages, here the plaintiff could only get the picture before the jury by revealing to the jury what the post-Watergate break-in investigation evidence disclosed. It was only through this evidence that the jury would have a more complete picture of what Goodyear had attempted to accomplish and in fact accomplished through its political contributions.
The third reason given for the inadmissibility of the political contributions and investigation evidence is that the jury was allowed to speculate from the evidence that unknown persons in the White House knew of and could attend to *86 Goodyear’s needs before the Department of Transportation. The majority states that a jury conclusion to this effect would be wholly without foundation, but the fact is that the majority’s statement is wholly without foundation. Only one fitted with blindfolders and earplugs could conclude that the Department of Transportation’s decision to close the K-rim wheel investigation did have direct or indirect White House influence.
Aside from the majority’s ignoring the political realities, the reason assigned for excluding the evidence misses the point. The evidence against Goodyear was admissible regardless of whether it could be proved that specific White House personnel could accomplish Goodyear’s objectives in the investigations pending before the Department of Transportation. The evidence certainly tended to prove Goodyear’s ulterior motives in making its political contributions, and it is, after all, Goodyear’s motives and conduct that form the basis for the jury to consider an award of exemplary damages. Whether or not Goodyear was successful in its efforts to influence government ccnduct by its political contributions is not necessary to an award of exemplary damages against Goodyear; but the evidence of Goodyear’s success gave to the jury a more complete picture of the magnitude of the involvement and the harm created by the collusion of big business and big government.
The evidence without question permitted a jury inference that people in high places were looking out for the interests of Goodyear. Goodyear knew how strongly the government was focusing on the serious problems that the wheel rims posed for the public, and Goodyear’s own people estimated a possible 145 million dollar cost to Goodyear. But then the Goodyear people went to work.
The evidence set forth by Justices Morrison and Sheehy, and that I have repeated in a different format in this dissent, surely gives rise to an inference that someone beyond the Department of Transportation influenced its decision to close the multi-piece wheel investigation. A serious safety *87 problem is hardly handled properly from the standpoint of either the government or the public, when the government makes the decision to close the investigation before the safety problems become too widely publicized.
Fifth and finally, the majority declares that the evidence is inadmissible because it permitted the jury to improperly speculate that Andrew Detrick “closed the K-rim investigation differently than those closed by his predecessors.” If there is evidence to suggest that Detrick followed standard operating procedures, and that Detrick was not influenced by improper motives, the majority do not suggest what it is. The evidence suggests, and the jury was entitled to believe, that improper political influence was the motivating factor behind the closure of the multi-piece wheel investigation.
Ample evidence exists in the record for the jury’s assessment of examplary damages against Goodyear. I would affirm the judgment.